JLW: 2020R00459

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO.** 24-cr-00057-LKG |
| | * | |
| **ANDRA SHIRONE THOMPSON,** | * | **(Conspiracy, 18 U.S.C. § 371;** |
| a/k/a "RICO SERRAS" | * | **Forfeiture, 18 U.S.C.** |
| | * | **§ 981(a)(1)(C); 21 U.S.C. § 853(p);** |
| **Defendant.** | * | **28 U.S.C. § 2461(c))** |
| | * | |

### INFORMATION

### COUNT ONE
### (Conspiracy)

The United States Attorney for the District of Maryland charges that:

### INTRODUCTION

At all times material to the Information:

1.     Defendant **ANDRA SHIRONE THOMPSON, also known as "Rico Serras,"** **("THOMPSON")** was a resident of Montgomery County, Maryland.

2.     **THOMPSON** was the owner of at least three businesses: Alpha Bravo Tango, LLC. ("ABT"), Senergy Consulting Group, Inc. ("SENERGY"), and Novus Ordo Seclorum, LLC., ("NOS").

3.     ABT was a Maryland-based company engaged in logistics and automotive activities.  SENERGY was a Colorado aged shelf-corporation that became registered to operate in Maryland.  It was purportedly engaged in an information technology and consulting business. NOS was a company based in the District of Columbia and engaged in consulting and business services.  **THOMPSON** was the sole individual associated with ABT, SENERGY, and NOS and exercised sole control over all bank accounts associated with those businesses.

4.     Unindicted Co-conspirator 1 ("UCC-1") was a resident of San Antonio, Texas. UCC-1 controlled an information technology and businesses services company (hereafter "Company-1").

5.     Celtic Bank was a federally insured financial institution headquartered in Salt Lake City, Utah.

6.     Main Street Bank was a federally insured financial institution headquartered in Fairfax, Virginia.

7.     Starting in at least April 2020 and continuing through at least August 2021, **THOMPSON**, UCC-1, and their co-conspirators, engaged in a scheme and artifice to defraud financial institutions and the United States, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

### *The Paycheck Protection Program*

6.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer-funded forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

7.     In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and

utility payments." The applicant (through its authorized representative) was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

8.      A business's PPP loan application was received and processed, in the first instance, by a participating financial institution approved by the United States Small Business Administration ("SBA"). If a PPP loan application was approved, the participating financial institution funded the PPP loan using its own monies. The SBA guaranteed the loans funded under the PPP.

9.      PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds towards payroll expenses.

10.     The PPP also allowed certain eligible borrowers that had previously received a PPP loan to apply for a second PPP loan, with the same general loan terms as their first PPP loan. These "second-round" loans could be used for the same purposes as were permitted for the first PPP loans, including payroll costs, interest on mortgages, rent, and utilities.

***The Economic Injury Disaster Loan Program***

3

11.    The Economic Injury Disaster Loan Program ("EIDL") was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

12.    The CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

13.    To obtain an EIDL loan, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

14.    EIDL loan applications were submitted directly to the SBA and processed by the agency with support from a government contractor. If the application was approved, the amount of the loan was based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold. Any funds issued under an EIDL loan were issued directly by the SBA.

15.    EIDL loan funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

**The Conspiracy**

16.    From at least April 2020 through at least August 2021, in District of Maryland, and elsewhere, defendant **ANDRA SHIRONE THOMPSON**, also known as "Rico Serras," did knowingly and intentionally, that is with the intent to advance the conspiracy, combine, conspire,

4

and agree with other individuals, known and unknown, to commit certain offenses against the United States, namely wire fraud, that is, to knowingly, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud the Small Business Administration, Celtic Bank, and Main Street Bank, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. § 1343.

### Object of the Conspiracy

17.    The object of the conspiracy was to obtain money and property of the United States and financial institutions by submitting false and fraudulent PPP and EIDL loan applications.

### Manner and Means

18.    In furtherance of the conspiracy, and to accomplish its object, **THOMPSON**, UCC-1, and their co-conspirators, used the followings methods, manners, and means:

19.    It was part of the conspiracy that **THOMPSON**, UCC-1, and others, submitted and caused the submission of materially false and fraudulent information to the SBA in connection with applications for EIDL advances and loans, including falsely and fraudulently representing to the SBA (1) the amount of the applicant businesses' gross revenues and cost of goods sold for the 12 months prior to January 31, 2020, and (2) the applicant businesses' number of employees as of January 31, 2020.

20.    It was further part of the conspiracy that **THOMPSON**, UCC-1, and their co-conspirators, falsely and fraudulently represented to the SBA the intended use of the EIDL loan proceeds by claiming that such funds would be used for the applicant businesses' working capital

or other legitimate purpose, when in truth and in fact, they intended to use the funds in violation of the program's requirements.

21.     It was further part of the conspiracy that **THOMPSON**, UCC-1, and their co-conspirators, submitted and caused the submission of materially false and fraudulent information to financial institutions, namely Celtic Bank and Main Street Bank, in connection with applications for PPP loans, including falsely and fraudulently representing to financial institutions ABT's number of employees and monthly payroll expenses.

22.     It was further part of the conspiracy that **THOMPSON**, UCC-1, and their co-conspirators, falsely and fraudulently represented to financial institutions the intended use of the PPP loan proceeds by certifying that, among other things, such funds would be used to retain workers and maintain payroll, when in truth and in fact, they intended to use the funds in violation of the program's requirements.

### *ABT EIDL LOAN*

23.     **THOMPSON**, UCC-1, and their co-conspirators made and caused the following material misrepresentations to be made to the SBA with respect to an EIDL loan application for ABT:

　　　　a.　On or about April 1, 2020, **THOMPSON** submitted and caused the submission of an application for an EIDL loan to the SBA on behalf of ABT.  In that application **THOMPSON** falsely claimed that ABT had 6 employees.  In truth and in fact, ABT did not pay any employees in the 12-months period that preceded the COVID-19 pandemic.

　　　　b.　In that same application, **THOMPSON** claimed that ABT had gross revenues of $600,000 in the 12-month period prior to the disaster.  In truth and in fact, ABT had few, if any, legitimate revenues during that period.

24.    Based on these material misrepresentations, on or about May 26, 2020, the SBA approved ABT's application for an EIDL loan for $150,000.  Also, on or about May 26, 2020, **THOMPSON** executed the loan authorization and agreement with the SBA on behalf of ABT by affixing his digital signature to the agreement.  By digitally signing the agreement, **THOMPSON** made an additional material misrepresentation, namely that ABT would use the loan proceeds "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"  In truth and in fact, **THOMPSON** intended to, and in fact did, misappropriate the ABT EIDL proceeds.

25.    On or about June 1, 2020, the SBA deposited $149,900 into a Main Street Bank checking account ending in 1285, which **THOMPSON** opened in the name of ABT and over which **THOMPSON** was the authorized signer (hereafter "the 1285 account").

26.    On or about June 1, 2020, **THOMPSON** transferred $149,900 from the 1285 account to a second Main Street Bank checking account ending in 1951, which **THOMPSON** opened in the name of ABT and over which **THOMPSON** was the authorized signer (hereafter "the 1951 account").

### *ABT PPP LOAN – MAIN STREET BANK*

27.    **THOMPSON**, UCC-1, and their co-conspirators made and caused the following material misrepresentations to be made to Main Street Bank with respect to an application for a PPP loan for ABT:

    a. On or about April 6, 2020, **THOMPSON** submitted and caused the submission of an application for a PPP loan to Main Street Bank on behalf of ABT requesting approximately $282,500.  In that application, **THOMPSON** claimed ABT had 13 employees and an average monthly payroll of approximately $113,000.  In

truth and in fact, ABT did not pay any employees in 2019 and the first quarter of 2020.

b. In that same application, **THOMPSON** certified that the information he provided in support of the application was true and accurate in all material respects. In truth and in fact, **THOMPSON** knew the information was not true or accurate because, among other things, ABT did not have employees.

28.    Main Street Bank did not approve **THOMPSON's** application for a PPP loan on behalf of ABT.

### *ABT PPP LOAN – CELTIC BANK*

29.    **THOMPSON**, UCC-1, and their co-conspirators made and caused material misrepresentations to be made to Celtic Bank with respect to a PPP application for ABT. Specifically:

a. On or about May 4, 2020, **THOMPSON**, using email address rico@pacificwest.com, sent emails to UCC-1 that included a list of ABT's purported employees and documents of incorporation. **THOMPSON** sent this information to UCC-1 knowing it would be used in a fraudulent loan application on behalf of ABT.

b. On or about May 13, 2020, an unindicted co-conspirator, using information provided by **THOMPSON** and UCC-1, submitted an application for a PPP loan to Celtic Bank on behalf of ABT requesting approximately $416,575. The application claimed ABT had 23 employees and an average monthly payroll of approximately $166,630. In truth and in fact, ABT did not pay any employees in 2019 and the first quarter of 2020.

30.     Based on this and other material misrepresentations, on May 18, 2020, Celtic Bank approved ABT's application for a PPP loan of $416,575.

31.     On or about May 21, 2020, Celtic Bank deposited approximately $416,575 into the 1285 account.

32.     On or about May 28, 2020, **THOMPSON** transferred approximately $416,600 from the 1285 account to the 1951 account.  **THOMPSON** executed this transaction knowing the funds involved had been obtained through material misrepresentations.

### *SENERGY EIDL LOAN*

33.     **THOMPSON**, UCC-1, and their co-conspirators made and caused the following material misrepresentations to be made to the SBA with respect to an EIDL application for SENERGY:

   a.   On or about June 19, 2020, **THOMPSON** submitted and caused the submission of an application for an EIDL loan to the SBA on behalf of SENERGY.  In that application, **THOMPSON** claimed SENERGY had 12 employees.  In truth and in fact, SENERGY did not pay any employees in the 12-month period that preceded the COVID-19 pandemic.

   b.   In that same application, **THOMPSON** claimed SENERGY had gross revenues of $3,100,000 in the 12-month period prior to the COVID-19 pandemic.  In truth and in fact, SENERGY had little, if any, legitimate revenues during that period.

34.     Based on these material misrepresentations, on or about June 24, 2020, the SBA approved SENERGY's application for an EIDL loan for $150,000.  Also, on or about June 24, 2020, **THOMPSON** executed the loan authorization and agreement with the SBA on behalf of SENERGY by affixing his digital signature to the agreement.  By digitally signing the agreement, **THOMPSON** made an additional material misrepresentation, namely that SENERGY would use

the loan proceeds "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020, and continuing thereafter[.]"  In truth and in fact, **THOMPSON** intended to, and in fact did, misappropriate the SENERGY EIDL funds for his own benefit.

35.     On or about June 26, 2020, the SBA deposited $149,900 into a Main Street Bank checking account ending in 0107, which **THOMPSON** opened in the name of SENERGY and over which **THOMPSON** was the authorized signer (hereafter "the 0107 account").

### *NOS EIDL LOAN*

36.     **THOMPSON**, UCC-1, and their co-conspirators made and the caused the following material misrepresentations to be made to the SBA with respect to an EIDL application for NOS:

    a.  On or about June 20, 2020, **THOMPSON** submitted and caused the submission of an application for an EIDL loan to the SBA on behalf of NOS.  In that application, **THOMPSON** claimed NOS had 12 employees.  In truth and in fact, NOS did not pay any employees in the 12-month period that preceded the COVID-19 pandemic.

    b.  In that same application, **THOMPSON** claimed NOS had gross revenues of $1,800,000 in the 12-month period prior to the COVID-19 pandemic.  In truth and in fact, NOS had little, if any, legitimate revenues during that period.

37.     Based on these material misrepresentations, on or about June 24, 2020, the SBA approved NOS's application for an EIDL loan for $150,000.  Also, on or about June 24, 2020, **THOMPSON** executed the loan authorization and agreement with the SBA on behalf of NOS by affixing his digital signature to the agreement.  By digitally signing the agreement, **THOMPSON** made an additional material misrepresentation, namely that NOS would use the loan proceeds

"solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"  In truth and in fact, **THOMPSON** intended to misappropriate the NOS EIDL funds for his own benefit, but the SBA was unable to fund the loan.

<u>**OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY**</u>

38.     In furtherance of the conspiracy and to accomplish its objects, the following overt acts were committed in the District of Maryland, and elsewhere:

    a.  On or about April 1, 2020, at or near Silver Spring, Maryland, **THOMPSON** submitted an electronic application for an EIDL loan to the SBA on behalf of ABT knowing the application contained material misrepresentations.

    b.  On or about April 6, 2020, at or near Silver Spring, Maryland, **THOMPSON** submitted an electronic application for a PPP loan to Main Street Bank on behalf of ABT knowing the application contained material misrepresentations.

    c.  On or about May 4, 2020, at or near Silver Spring, Maryland, **THOMPSON** used email address rico@pacificwest.com to send an email to UCC-1 containing a list of ABT employees.  At the time he sent this email, **THOMPSON** knew these employees did not exist and that this information would be used to create a fraudulent PPP loan application.

    d.  On or about June 19, 2020, at or near Silver Spring, Maryland, **THOMPSON** submitted an electronic application for an EIDL loan to the SBA on behalf of SENERGY knowing the application contained material misrepresentations.

    e.  On or about June 20, 2020, at or near Silver Spring, Maryland, **THOMPSON** submitted an electronic application for an EIDL loan to the SBA on behalf of NOS knowing the application contained material misrepresentations.

(In violation of 18 U.S.C. § 371).

11

**COUNT TWO**
**(Conspiracy)**

**INTRODUCTION**

At all times relevant to this information:

39.     The allegations set forth in paragraphs 1 through 4 are re-alleged and incorporated herein by reference.

40.     Navitas Credit Corporation (hereafter "Navitas") was headquartered in Ponte Verde, Florida, and was a lender that provided financing to businesses seeking to acquire equipment.

41.     TCF Financial Corporation, also known as Huntington Bank, (hereafter "TCF"), was headquartered in Detroit, Michigan, and was a lender that provided financing to businesses seeking to acquire equipment.

42.     Technology Finance Corporation, (hereafter "Tech Finance"), was headquartered in Scottsdale, Arizona, and was a lender that provided financing to businesses seeking to acquire equipment.

43.     Hanmi Bank (hereafter "Hanmi") was owned by Hanmi Financial Corporation and was headquartered in Los Angeles, California, and was a lender that provided financing to businesses seeking to acquire equipment.

**The Conspiracy**

44.     From at least November 2019 and continuing through the date of this information, in the District of Maryland, and elsewhere, the defendant, **ANDRA SHIRONE THOMPSON**, also known as "Rico Serras," did knowingly and intentionally, that is with the intent to advance the conspiracy, combine, conspire, and agree with other individuals, known and unknown, to commit certain offenses against the United States, namely wire fraud, that is, to knowingly, and

with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud

Navitas, TCF, Tech Finance, Hanmi, and others, and to obtain money and property by means of

materially false and fraudulent pretenses, representations, and promises, knowing such pretenses,

representations, and promises were false when made, transmit and cause to be transmitted, by

means of wire communications in interstate and foreign commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme and artifice, in violation of 18

U.S.C. § 1343.

### Object of the Conspiracy

45.    The object of the conspiracy was to defraud commercial equipment financing

companies to obtain money to which the conspirators were not entitled by falsely representing that

they had engaged in the sale of computer servers, equipment, and services with customers.

### Manner and Means

46.    It was part of the conspiracy that **THOMPSON**, UCC-1, and their co-conspirators

represented to equipment financing companies that SENERGY and Company-1 were legitimate

computer sales and service companies that provided products and services to customers.  In truth

and in fact, each was a shell corporation the conspiracy used to defraud equipment financing

companies.

47.    It was further part of the conspiracy for SENERGY and Company-1 to present false

invoices to equipment financing companies that showed the sale of computer servers and related

equipment to customers seeking financing.  Relying on these false invoices, the equipment

financing company would extend credit to customers in the form of either a lease agreement or

equipment financing agreement.  In truth and in fact, the customers did not purchase or intend to

purchase the equipment shown on the invoice, nor were the indicated items provided by

SENERGY or Company-1.

48.     It was further part of the conspiracy that after the financing agreements were complete, the equipment financing companies would disburse money to bank accounts controlled by SENERGY or Company-1 in amounts equal to the false invoices.  Once in receipt of the funds, **THOMPSON**, UCC-1, and their co-conspirators would remit portions of the money back to the customers and keep the remaining proceeds for themselves or share them with brokers who referred customers to the conspiracy.

### *LOAN FROM NAVITAS FOR $89,261.80*

49.     On or about April 1, 2020, UCC-1, in the guise of "Rico Serras," used email address senergyconsultinggroup@gmail.com to send an invoice to a representative from Navitas.  The invoice falsely indicated the sale of a computer server and related equipment to a customer (hereafter "Customer-1") by SENERGY for approximately $89,261.80

50.     On or about April 6, 2020, relying on the false SENERGY invoice, Navitas entered into an equipment financing agreement with Customer-1 for approximately $89,305.

51.     On or about April 7, 2020, Navitas deposited approximately $89,261.80 into the 0107 account.

52.     On or about April 8, 2020, **THOMPSON** wired approximately $84,261 from the 0107 account to a Truist checking account ending in 3134 in the name of Company-1 and controlled by UCC-1.  **THOMPSON** wired the money knowing it had been obtained through material misrepresentations to Navitas.

53.     Between on or about April 16-21, 2020, UCC-1 remitted a portion of the loan proceeds he received from **THOMPSON** to Customer-1 in the form of three checks totaling $70,203.08.

### LOAN FROM TCF FOR $499,923.66

54.     On or about March 22, 2021, UCC-1 provided TCF an invoice that falsely showed the sale of computer servers and related equipment to SENERGY by Company-1 for approximately $485,362.78.  The invoice further indicated that Company-1 was entitled to a 3% referral fee for brokering the deal between SENERGY and TCF, bringing the total payment due to Company-1 to $499,923.66.

55.     On or about March 22, 2021, **THOMPSON** electronically executed an installment payment agreement with TCF on behalf of SENERGY to finance the purchase of computer equipment from Company-1 for $485,362.78, as indicated on the invoice. In executing the agreement, **THOMPSON** falsely affirmed, among other things, that he had not been promised any rebate, credit, refund, or compensation except as disclosed in the invoice, and that at the time TCF paid Company-1 the equipment indicated in the invoice would be delivered to SENERGY's business address.  In truth and in fact, **THOMPSON** never received or intended to receive the equipment indicated in the invoice from Company-1.  Instead, **THOMPSON** expected to receive a portion of the loan proceeds from UCC-1.

56.     On or about March 23, 2021, TCF disbursed approximately $499,923.66 to a Security Service Federal Credit Union account ending in 8071 belonging to Company-1.

### LOAN FROM TECH FINANCE FOR $224,177.28

57.     On or about July 29, 2021, UCC-1 and another unindicted co-conspirator executed an installment purchase agreement with Tech Finance on behalf of Company-1 to purchase computer servers and related equipment from SENERGY for approximately $224,177.28.  This price was based on a SENERGY invoice that was submitted in support of Company-1's equipment financing application.  As part of the agreement with Tech Finance, UCC-1 acknowledged that the

installment payment agreement would be assigned to Hanmi and that all payments due under the agreement would be made to Hanmi.

58.    On or about August 2, 2021, Tech Finance assigned Company-1's installment purchase agreement to Hanmi.

59.    On or about August 4, 2021, Hanmi disbursed approximately $224,177.28 to the 0107 account belonging to SENERGY and controlled by **THOMPSON**.

60.    Also, on or about August 4, 2021, **THOMPSON** transferred approximately $150,000 from the 0107 account to the 1285 account belonging to ABT, which **THOMPSON** also controlled.

61.    Also, on or about August 4, 2021, **THOMPSON** transferred approximately $150,000 from the 1285 account to the 1951 account belonging to ABT, which **THOMPSON** also controlled.

62.    Also, on or about August 4, 2021, **THOMPSON** wired approximately $150,000 from the 1951 account to a Security Service Federal Credit Union checking account ending in 4000 belonging to UCC-1.

**Overt Acts in Furtherance of the Conspiracy**

63.    In furtherance of the conspiracy and to accomplish its objects, the following overt acts were committed in the District of Maryland, and elsewhere:

    a.    On or about April 8, 2020, at or near Silver Spring, Maryland, **THOMPSON** wired approximately $84,261 to a Truist checking account ending in 3134 in the name of Company-1. **THOMPSON** wired the money knowing it had been obtained through material misrepresentations to Navitas and intending to further the object of the conspiracy.

    b.  On or about March 22, 2021, at or near Silver Spring, Maryland, **THOMPSON** electronically executed an installment payment agreement with TCF on behalf of SENERGY to finance the purchase of computer servers and related equipment from Company-1 for $485,362.78.  **THOMPSON** executed the agreement knowing it contained material misrepresentations and intending to further object of the conspiracy.

    c.  On or about August 4, 2021, **THOMPSON**, at or near Silver Spring, Maryland, **THOMPSON** wired approximately $150,000 from the 1951 account to a Security Service Federal Credit Union account ending in 4000.  **THOMPSON** wired the money knowing it had been obtained through material misrepresentations to Tech Finance and Hanmi and intending to further object of the conspiracy.

(In violation of 18 U.S.C. § 371).

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland further alleges that:

1.      Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), as a result of the defendant's conviction under the offense in Count One of this Information.

2.      Upon conviction of the offenses in Counts One and Two of this Information, the defendant,

## ANDRA SHIRONE THOMPSON

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

3.      The property to be forfeited includes, but is not limited to, a money judgment in the amount of at least $847,248.01

### Substitute Assets

4.      If any of the property described above, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

18

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C.

§ 853(p), as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

2/26/2024
_____
       Date

E. L. B. / G. L.
_____
Erek L. Barron
United States Attorney

Glenn Leon
Chief, Fraud Section

_____
Joseph Wenner
Assistant United States Attorney

_____
David A. Peters
Trial Attorney, Fraud Section

19